UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TIMOTHY DAVID MURPHY,                  )
# 183248,                              )
                                       )
                    Plaintiff,         )        Case No. 1:14-cv-269
                                       )
v.                                     )        Honorable Paul L. Maloney
                                       )
STEVEN KARBER, et al.,                 )        **OPINION**
                                       )
                    Defendants.        )
_____)

This is a civil rights action brought *pro se* by a state prisoner under 42 U.S.C.

§ 1983. Plaintiff is an inmate at the G. Robert Cotton Correctional Facility. (ECF No.

76). His complaint concerns the handling of various items of incoming mail at the

Ionia Correctional Facility (ICF) between January 26, 2011, and March 20, 2012.

(Compl. ¶ 22, ECF No. 1, PageID.6-11). The defendants are Mailroom Clerks Steven

Karber and Craig Lantagne, and Assistant Resident Supervisors Erric Smith and

Jennifer Gehoski.[1]

Plaintiff's complaint consists of four Counts: (1) alleged violation of plaintiff's

First Amendment rights under the Free Speech Clause by all defendants (ECF No. 1

at PageID.15-16); (2) alleged violation of plaintiff's First Amendment right of "freedom

of expressive association" by all defendants (*Id.* at PageID .16-17); (3) alleged

retaliation in violation of plaintiff's First Amendment rights against defendants Karber

_____

[1]Plaintiff also named Warden John Prelesnik as a defendant. All plaintiff's
claims against Warden Prelesnik were dismissed on May 23, 2014. (ECF No. 10-11).

and Lantagne (*Id.* at PageID.17-18); and (4) alleged violation of plaintiff's rights under the Fourteenth Amendment's Due Process Clause by defendants Karber and Lantagne (*Id.* at PageID.18-19). Plaintiff also asks the Court, in its discretion, to exercise supplemental jurisdiction over purported state law claims. (*Id.* at PageID.15-19). Plaintiff seeks declaratory relief and an award of damages against defendants in their individual capacities.[2] (*Id.* at 2, 14-17, ECF No. 1, PageID.4, 16-19).

The matter is now before the Court on defendants' motion for summary judgment. (ECF No. 62). Plaintiff has filed his response. (ECF No. 68). For the reasons set forth herein, plaintiff's request for declaratory relief will be dismissed as moot. Defendants' motion for summary judgment will be granted on all plaintiff's federal claims. The Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's purported state-law claims.

## **Applicable Standards**

### A. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

---

[2]All other claims have been dismissed. (ECF No. 10, 11).

matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could

reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

B.   Qualified Immunity

Defendants argue that they are entitled to summary judgment on plaintiff's claims for damages against them in their individual capacities on the basis of qualified immunity. "Once [an] official[ ] raise[s] the qualified immunity defense, the plaintiff bears the burden to 'demonstrate that the official [is] not entitled to qualified immunity.' " *LeFever v. Ferguson*, 645 F. App'x  438, 442 (6th Cir. 2016) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *see Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).

"A government official sued under section 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *see Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014).  The first prong of qualified immunity analysis is whether the plaintiff has alleged facts showing that each defendant's conduct violated a constitutional or statutory right.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The second prong is whether the right was "clearly established" at the time of the defendant's alleged misconduct.  *Id.*  Trial courts are permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. At the summary judgment stage, "the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which a jury could reasonably find for the plaintiff.'" *Thompson v. City of Lebanon, Tenn.*, 831 F.3d 366, 370 (6th Cir. 2016); *see Holsey v. Wieber*, 811 F.3d 844, 846 (6th Cir. 2016); *see also Zuhl v. Haskins*, 652 F. App'x 358, 361(6th Cir. 2016).

In *Brosseau v. Haugen*, the Supreme Court examined the underlying purpose of the requirement that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, . . . misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. 194, 198 (2004); *see also Ziglar v. Abbasi,* 137 S. Ct. 1873, 1867 (2017) ("If a reasonable officer might not have known for certain that the conduct was unlawful –

then the officer is immune from liability.") (quotation and citation omitted); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is whether the violative nature of the particular conduct is clearly established.") (citation and quotation omitted); *City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate.") (citations and quotations omitted); *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).

The Supreme Court has repeatedly held that the second prong of the qualified immunity analysis "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier v. Katz*, 533 U.S. at 201); *see White v. Pauly*, 137 S. Ct. 548, 552 (2017). Moreover, courts are "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. at 2023 (citations and quotations omitted); *see White v. Pauly*, 137 S. Ct. at 552. In order to be clearly established, existing precedent must have placed the unlawfulness of the

official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424.

"The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.' " *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Estate of Hill v. Miracle*, 853 F.3d at 312 ("[T]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (quotation and citation omitted). The burden applies to each claim that the plaintiff is asserting against a defendant. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

## Facts

The following facts are beyond genuine issue. Plaintiff is an inmate in the custody of the Michigan Department of Corrections. He is serving multiple life sentences and is currently an inmate at the G. Robert Cotton Correctional Facility (JCF). At all times relevant to this lawsuit, January 26, 2011, through March 20, 2012, plaintiff was an inmate held in administrative segregation at the Ionia Correctional Facility (ICF).[3] (Plf. Aff. ¶ 2, ECF No. 68-2, PageID.462; Plf. Dep. at 31, ECF No. 68-1, PageID.448). Plaintiff named four employees of the Michigan Department of Corrections (MDOC) at ICF as defendants: Mailroom Clerks Steven

_____

[3]Plaintiff's complaint is not properly verified under penalty of perjury such that it can be considered as an affidavit in opposition to defendants' motion. Plaintiff interjected limitations that his allegations were made "to the best of [his] own personal knowledge, information and belief." The Court's ruling does not work any hardship. The arguments in plaintiff's brief (ECF No. 68) are based on his affidavit and his deposition testimony.

Karber and Craig Lantagne, and Assistant Resident Supervisors (ARUS) Erric Smith and Jennifer Gehoski.

Plaintiff objects to the handling of various items of incoming mail sent to him by Prison Legal News, prisoner Joseph Hoffman, and Jimmy Sabin. (Plf. Dep. at 35-40, ECF No. 68-1, PageID.452-57). Prison Legal News is a monthly publication.[4] Prisoner Hoffman was a participant in plaintiff's elaborate attempt to escape from the Kinross Correctional Facility by tunneling out of the prison.[5] Jimmy Sabin is a convicted felon and registered sex offender. At all times relative to plaintiff's complaint, Mr. Sabin was a resident of Vassar, Michigan. Jimmy Sabin was held in MDOC custody "from 1990 to 1999."[6] Mr. Sabin is a "regular and prodigious sender of mail to prisoners within the Michigan Department of Corrections (MDOC)." (Sabin Aff. ¶ 2, ECF No. 68-21, PageID.691). He generally does not identify himself as the sender of these materials. Instead, he uses a post office box address in Vassar, Michigan, and sends material to ICF under the auspices of a sole proprietorship, which he refers to

---

[4]*See Prison Legal News v. Livingston*, 683 F.3d 201 (5th Cir. 2012). It is well-settled that a federal court can take judicial notice of its own records and proceedings in other courts. *See Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999); *Siner v. City of Detroit*, No. 15-cv-13532, 2017 WL 1190946, at *2 (E.D. Mich. Mar. 30, 2017).

[5]*See Murphy v. Lockhart*, 826 F. Supp. 2d 1016, 1021 (E.D. Mich. 2011); *see also Hoffman v. Rutter*, No. 2:10-cv-269, 2011 WL 4560916, at *5 (W.D. Mich. Aug. 24, 2011). "[P]laintiff's plan to escape from KCF was foiled when prison officials discovered the tunnel that he and his cellmates had managed to dig from their cell to the outer perimeter of KCF." 826 F. Supp. 2d at 1022.

[6]*Lantagne v. Sabin*, Nos 312269, 315533, 312270, 315532, 2014 WL 2118226, at *1 (Mich. Ct. App. May 20, 2014).

as the Heritage Bible Fellowship (HBF). Mr. Sabin refers to himself as HBF's founder and operator. Mr. Sabin refers to HBF as Messianic ministry without further elaboration of this faith and its religious practices. (*Id.* at ¶ 5, PageID.692). There is no evidence before the Court connecting any of the mail rejections at issue in this lawsuit with any religious practice.

A Notice of Package/Mail Rejection is an initial step in the MDOC's process of determining whether an item of incoming mail believed to be contraband will be excluded. The Notice identifies the item and the reason(s) why it is believed to be in violation of policy. The prisoner is provided with a copy of the Notice and a copy is sent to the sender, if a return address is provided. (Policy Directive 05.03.118 (effective 09/14/09), ¶ OO, ECF No. 68-10, PageID.620; Karber Dep. at 19-20, ECF No. 68-19, PageID.667-68). MDOC prisoners have means at their disposal for challenging a proposed mail rejection.[7] Unless the prisoner waives his right to a hearing in writing or the prisoner and staff agree as to the appropriate disposition of the mail, a hearing is conducted. The hearing officer is not the person who issued the Notice. (Policy Directive 05.03.118 at ¶ PP, ECF No. 68-10, PageID.620; Karber Dep. at 22-23, ECF No. 68-19, PageID.670-71; Lantagne Dep. at 24-25, ECF No. 68-20, PageID.686-87). Acting as a hearing officer is one of the duties of an assistant resident supervisor (ARUS). (Policy Directive 05.03.118, ¶ PP, QQ, ECF No. 68-10, PageID.620; ECF

---

[7]The sender's means of appealing the Notice of Package/Mail Rejection is by mailing a letter addressed to the facility head within ten days after the date of the Notice appealing the proposed rejection. (*Id.* at ¶ YY, PageID.621).

No. 68-23, PageID.697). If a hearing is conducted, an Administrative Hearing Report is completed by the hearing officer. If the hearing officer finds that the item of mail does not violate policy, the prisoner is entitled to receive it. (Policy Directive 05.03.118, ¶ SS, ECF No. 68-10, PageID.620). If the hearing officer finds that the item is contraband, the prisoner can appeal the decision through all three steps of the MDOC's grievance process. (*Id.* at ¶ XX, PageID.621). The process for disposition of rejected mail is defined by the policy directive. With few exceptions, such as where mail is turned over to law enforcement officials for possible criminal prosecution, the prisoner has the option of returning the mail to the sender at his own expense. (*Id.* at ¶¶ RR-TT, ZZ-AAA, PageID.620-22).

Plaintiff challenges the following instances in 2011 where incoming mail items were excluded from ICF.

1.    # 0511-113

On May 24, 2011, Mailroom Clerk Karber issued Notice of Package/Mail Rejection # 0511-113. The mail was from Prison Legal News to plaintiff. The mail was described as Prison Legal News March 2011 issue, pages 24-26, which faulted a private prison company for a deadly Arizona prison break. (ECF No. 68-7, PageID.499). On May 31, 2011, ARUS Eric Smith conducted an administrative hearing. Mr. Smith read the article and found that it did describe an escape from an Arizona prison. Further, it described weaknesses in prison security, which is a threat to any prison. (*Id.* at PageID.500).

Plaintiff states that, during his subsequent confinement at the Bellamy Creek Correctional Facility[8] in August 2012, he discovered that the prison's library had current and back issues of Prison Legal News. Thus, he was able to obtain a copy of this article. (Plf. Aff. ¶ 23, ECF No. 68-2, PageID.467-68; ECF No. 68-17, PageID.658-60).

2.    # 0811-054

On August 8, 2011, Mailroom Clerk Lantagne issued Notice of Package/Mail Rejection # 0811-054. The mail was from Mr. Sabin, through Heritage Bible Fellowship (HBF), P.O. Box 25, Vassar, Michigan, and it was addressed to plaintiff. The mail was described as handwritten pages containing a code/underlined words and # 8s at the bottom of page 4 and top of page 5, and threats towards staff. It also contained two recall petition forms and an instruction sheet. (ECF No. 68-7, PageID.501). On August 15, 2011, ARUS Smith conducted an administrative hearing. He found that plaintiff was not allowed to possess these items. Plaintiff elected to send

---

[8]ICF is a higher security level prison than the Bellamy Creek Correctional Facility. ICF is comprised of five Level V housing units and two Level II housing units. Two of the Level V housing units are designated Administrative Segregation. http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5368--,00.html (last visited on Sept. 18, 2017). Level V prisoner is a classification reserved for the prison system's "most dangerous and unmanageable prisoners." *Jackson v. Stoddard*, No. 1:13-cv-1297, 2014 WL 2862614, at *1 (W.D. Mich. June 24, 2014). "Level V is the highest security level of the five-level Michigan classification system[.]" *Mays v. Gorman*, No. 1:11-cv-694, 2013 WL 504234, at * 1 (W.D. Mich. Feb. 12, 2013).

Bellamy Creek is a multi-level prison facility housing prisoners at Security Levels I, II, and IV general population prisoners. http://www.michigan.gov/corrections/0,4551,7-119-68854_1381_1385-5481--,00.html (last visited on Sept. 18, 2017).

the letter back to the sender at his expense and to have the other materials destroyed. (*Id.* at PageID.502).

3.  # 0811-061

On August 10, 2011, defendant Lantagne issued Notice of Package/Mail Rejection # 0811-061. He indicated that this item was being rejected because it contained a detailed map and a coded letter. (*Id.* at PageID.504).

On August 18, 2011, ARUS Smith conducted an administrative hearing on Notice of Package/Mail Rejection # 0811-061. The Administrative Hearing Report indicates that the items at issue were a detailed Google Map and a letter that might have contained a coded message. Although the hearing officer had concerns about the odd pattern of underlining, which appeared under words which would not normally be underlined for purposes of emphasis,[9] he nonetheless allowed prisoner Murphy to have this letter. ARUS Smith did not allow prisoner Murphy to have the detailed Google map, however. (*Id.* at PageID.505).

Plaintiff states that after he was transferred to the Bellamy Creek Correctional Facility in 2012, he was able to obtain from Mr. Sabin a "USGS National Water

---

[9]Mr. Sabin provided typing services for plaintiff. (Plf. Dep. at 19, ECF No. 68-1, PageID.446). It is noted that none of Mr. Sabin's odd handwritten letters have been presented as evidence in support of plaintiff's claims. Mr. Sabin states that almost all his letters to MDOC inmates were and are hand-printed and they "didn't require a computer to compose." (Sabin Aff. ¶ 12, ECF No. 68-21, PageID.693). Mr. Sabin states that his "generally *hand[-] printed* letters" use recognized English forms such as underlining, upper case letters, blocks, bold, italics to "explain the relevancy of materials sent, offer suggestions and strategies on issues, and share life stories." (*Id.* at ¶ 12, PageID.693).

Information System Mapper photograph of the Sabin homestead" without having a Notice of Package/Mail Rejection issued by MDOC employees at Bellamy Creek. Plaintiff considers the USGS photograph to be the equivalent of the rejected Google map. (Murphy Aff. ¶ 24, ECF No. 68-2, PageID.468; ECF No. 68-18, PageID.662).

    4.   <u># 0911-040</u>

On September 13, 2011, Lantagne issued Notice of Package/Mail Rejection # 0911-040. The mail was from Mr. Sabin, through HBF, to plaintiff. It was described as a 2011-2012 opinion petition to the Michigan legislature, a page, two sides, with areas for names, signatures and addresses. (ECF No. 68-7, PageID.535). ARUS Gehoski conducted the administrative hearing. Ms. Gehoski determined that the rejection of the mail was appropriate. (*Id*. at PageID.536; ECF No. 68-23, PageID.698).

Plaintiff Murphy sought review of this decision through the MDOC's grievance process. The MDOC found at Step III of the grievance process that the description that Mr. Lantagne provided in the Notice was deficient. "A new Notice and administrative hearing would be in order, however, the record indicates that the document was returned to the sender on 12-14-11. No further action is necessary pursuant to the grievance process." (ECF No.68-9, PageID.604; Plf Aff. ¶ 11, ECF No. 68-2, PageID.465).

Plaintiff states that during his subsequent incarceration at the Bellamy Creek Correctional Facility, in July 2012, he received a copy of the petition from Mr. Sabin. (Plf. Aff. ¶ 20, ECF No. 68-2, PageID.466-67; ECF No. 68-14, PageID.648-49).

5.     # 1011-020 and #1011-021

On October 25, 2011, Mr. Karber issued Notice of Package/Mail Rejection # 1011-020. This was mail from Mr. Sabin, through HBF, addressed to plaintiff. The mail was described as a detailed article regarding the Attica Prison riots that had been copied from the September 8, 2011, New York Times. (ECF No. 68-7, PageID.540). On November 2, 2011, ARUS Gehoski conducted the administrative hearing. She determined that the item posed a threat to the security and good order of the prison and encouraged criminal activity. (*Id.* at PageID.541).

On October 25, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1011-021. This was mail from Prison Legal News addressed to plaintiff. It was described as a detailed news article regarding the Attica Prison riots. On November 2, 2011, ARUS Gehoski conducted the administrative hearing. She determined that the item posed a threat to the security and good order of the prison. (*Id.* at PageID.545).

Plaintiff states that he was later able to obtain copies of this article on the Attica Prison riots while he was an inmate at the Bellamy Creek Correctional Facility in July 2012 through Mr. Sabin and in August 2012 through another friend another friend. (Plf. Aff. ¶ 18, ECF No. 68-2, PageID.466; ECF No. 68-12, PageID.635-36).

6.     # 1111-115

On November 16, 2011, Lantagne issued Notice of Package/Mail Rejection # 1111-115. This mail was from Mr. Sabin, through HBF, to plaintiff. It was described as being copies of a publication including a table of contents that were not direct from the publisher in violation of PD 05.03.118 ¶¶ CC. (ECF No. 68-7, PageID.546). ARUS

Gehoski conducted the administrative hearing. Ms. Gehoski affirmed the rejection of a 118 page document entitled "Tolerating Failure: The State Health Care and Mental Health Delivery in the Michigan Department of Corrections" and a 58-page document entitled "Psychiatric Effects of Solitary Confinement Stuart Grassian" under this policy directive. ARUS Gehoski also upheld the rejection of a "Google search of Stuart Grassian" because it contained personal information regarding Grassian and Grassian's family. The materials in this package were voluminous and prisoner Murphy was permitted to receive many items. ARUS Gehoski wrote: "The following papers will be given to Murphy as they are not a violation of Policy and do not jeopardize the safety and security of the institution: 'Overview: Neuropsychiatric Effects of Solitary Confinement'; internet article on Brant D. Fries, PhD.; 'Testimony of Impact of Isolation, July 19, 2005,' and 2 papers that have copies of newspaper articles on them." (*Id.* at PageID.547; ECF No. 68-23, PageID.698-99).

Plaintiff pursued an unsuccessful appeal in the MDOC's grievance process. (Plf. Aff. ¶ 21, ECF No. 68-2, PageID.467; ECF No. 68-15, PageID.650-54).

Plaintiff states that, during his subsequent confinement at the Bellamy Creek Correctional Facility in August 2012, he was able to obtain from Mr. Sabin the document entitled "Psychiatric Effects of Solitary Confinement Stuart Grassian." (Plf. Aff. 22-23, ECF No. 68-2, PageID.467; ECF No. 68-16, PageID.657).

7.    # 1111-136

On November 22, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1111-136. It was mail to plaintiff from Prison Legal News. The mail is

described as Prison Legal News, Volume 22, No. 11, page 34, Ohio prisoner escape described in detail and hostage taking after the escape. (ECF No. 68-7, PageID.550). ARUS Gehoski conducted an hearing. She found that page 34 described in "vivid detail" what the prisoner used to escape, how he escaped and how he took a hostage. Ms. Gehoski found that the mail constituted a very serious threat to the security of the prison. Accordingly, it was rejected pursuant to Policy Directive 03.03.118 ¶¶ D and MM and plaintiff was not allowed to receive it. (*Id.* at PageID.551; ECF No. 68-23, PageID.699).

Plaintiff states that, during his subsequent confinement at the Bellamy Creek Correctional Facility in August 2012, he discovered that the prison's library had current and back issues of Prison Legal News. Thus, he was able to obtain a copy of this article. (Plf. Aff. ¶ 23, ECF No. 68-2, PageID.467-68; ECF No. 68-17, PageID.661).

8.    # 1111-142A

On November 30, 2011, Mailroom Clerk Karber issued Notice of Package/Mail Rejection # 1111-142A. It was mail to plaintiff from Mr. Sabin through HBF. The mail was described as five sheets of paper printed off the Internet from Prison Legal News not received directly from the publisher. (ECF No. 68-7, PageID.552). ARUS Gehoski conducted the administrative hearing. Ms. Gehoski noted that the mail consisted of five pages printed on the front and back that had been copied from the November 2011 issue of Prison Legal News. Generally mail must come directly from the publisher. Plaintiff was allowed to receive all pages other than page 26, however, under the exception for photocopies of a few pages. Plaintiff was not allowed to received page 26

-16-

because the article provided a detailed description of sexual acts with children.  (*Id.* at PageID.553).

9.    #1111-142C

On November 30, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1111-142C.  It was mail from Mr. Sabin through HBF.  The mail was described as eight pages printed off the Internet regarding doctors and psychologists with personal information such as license type, addresses, full names, and professions. (ECF No. 68-7, PageID. 559).  ARUS Gehoski conducted the administrative hearing. She found that the mail contained very personal information such as license type, profession, permanent ID numbers, addresses, etc.  Ms. Gehoski found that this information was not allowed per policy and that plaintiff would not be given the papers.  (*Id.* at PageID.560).

Plaintiff sought review through the MDOC's grievance process.  On November 29, 2012, the Grievance and Appeals Section issued an amended Step III response finding that the material appeared to contain only professional information, rather than personal information about a particular mental health professional.  It overruled the rejection of this mail.  (ECF No. 68-9, PageID.610; Plf. Aff. ¶ 12, ECF No. 68-2, PageID.465).

10.    #1211-037

On December 9, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-037.  It was mail from Mr. Sabin through HBF.  The mail was described as a two-page sheet of paper with names, addresses, and phone numbers.  (ECF No. 68-7,

PageID.566).  ARUS Gehoski conducted the administrative hearing.  She found that the pages contained personal information including addresses, phone numbers, e-mail addresses and that plaintiff would not be allowed to possess the mail because it violated Policy Directive and Operating Procedure 05.03.118.  (*Id.* at PageID.567).

11.    # 1211-063

On December 20, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-063.  It was mail from Mr. Sabin through HBF.  The mail was described as items posing a threat to the security of the prison facility and staff members.  (*Id.* at PageID.570).  ARUS Gehoski conducted the administrative hearing.  Ms. Gehoski found that the mail contained a variety of information on and in regard to MDOC staff members.  The mail was prohibited under Policy Directive 05.03.118 ¶¶ D and MM because the contents posed a threat to the security, good order, and discipline of the facility.  (*Id.* at PageID.571).

12.    # 1211-084

On December 22, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-084.  It was mail from Mr. Sabin through HBF. The mail was described as an attempt to circumvent the mail policy in sending addresses, personal information, etc.  (*Id.* at PageID.573).  ARUS Gehoski conducted the administrative hearing.  Ms. Gehoski found that the mail contained personal information regarding prison staff.  The mail was prohibited under applicable policy directive and operating procedure because it posed a threat to the safety and good order of the facility.  (*Id.* at PageID.574).

On January 17, 2012, Mailroom clerks Karber and Lantagne sought and obtained PPOs in Ionia County Circuit Court against Mr. Sabin. The orders prohibited Mr. Sabin from discussing Karber and Lantagne by name, job title, code or any other means. (Plf. Aff.¶ 5, ECF No. 68-2, PageID.463). Judge Suzanne Kreeger found that Mr. Sabin's "actual intent or purpose relative to sending certain information and statements in various communications was to harass [Karber and Lantagne] and not to legitimately conduct HBF affairs, legitimately seek redress of grievances or to legitimately pursue enforcement of policies. . . . [His] statements and information were meant to frighten, harass, and intimidate [Karber and Lantagne.]"[10]

Plaintiff challenges two instances in 2012 where incoming mail items were excluded from ICF.

---

[10] *Lantagne v. Sabin*, 2014 WL 2118226, at *1. On May 20, 2014, the Michigan Court of Appeals rejected Sabin's challenges to Judge Kreeger's PPOs, affirmed her decisions, and awarded taxable costs against Mr. Sabin. 2014 WL 2118226, at *3-4. In July 2014, Judge Kreeger found that Mr. Sabin violated the PPOs and ordered that he be sentenced to fourteen days in the county jail, with sentence suspended pending strict compliance with the PPOs. On September 29, 2014, the Michigan Supreme Court denied Mr. Sabin's application for leave to appeal. *See Lantagne v. Sabin*, 853 N.W.2d 362 (Mich. 2014). On March 9, 2015, the Supreme Court of the United States denied Mr. Sabin's petition for a writ of certiorari. *See Sabin v. Karber*, 135 S. Ct. 1532 (2015).

Plaintiff's dissatisfaction with Judge Kreeger's orders and her enforcement of those orders cannot be litigated here. This Court does not possess direct oversight powers over Michigan's courts. *See* 28 U.S.C. § 1257; *see also In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009). Plaintiff's avenue for attempting to challenge the orders was through the Ionia County Circuit Court, the Michigan Court of Appeals, and the Supreme Court of the United States.

13.  # 0212-073

On February 17, 2012, defendant Lantagne issued Notice of Package/Mail Rejection # 0212-073.  It was mail from Mr. Sabin through HBF.  The mail was described as one page, front and back, containing prisoner information and current locations. (ECF No. 68-7, PageID.586).  On February 27, 2012, ARUS Ault conducted an administrative hearing.  Plaintiff was not allowed to possess the letter because it was considered a threat to the order and security of the facility.  (*Id.* at PageID.587).

14.  # 0212-120

On February 29, 2012, defendant Lantagne issued Notice of Package/Mail Rejection # 0212-120.  It was mail from Prisoner Legal News.  The mail was described as Volume 23, Number 2, pages 15, 30, 38, and 39.  (*Id.* at PageID.590).  On March 6, 2012, ARUS Ault conducted an administrative Hearing.  Mr. Ault found that the article titled "Washington Prisoner Killed During Prison Industries Escape Attempt" described in detail how two prisoners attempted an escape, the tools that they used to take a prison employee hostage, and how they had packed supplies to take with them once they had escaped.  Plaintiff was not allowed to receive this mail.  (*Id.* at PageID.591).

In all other instances during the period at issue, it is undisputed that plaintiff received his mail.  Plaintiff did not support any of his delay-based claims with copies the underlying mail items that he received.  Photocopies of the postmarked and date-stamped envelopes are, with one exception, absent.  Plaintiff does provide a chart of the date that mail was "posted" (ECF No. 68-2, PageID.464-65), but he provides no

explanation of the source of those dates. Claims against the mailroom clerk defendants depend on the date that the mail was received at ICF, not the date it may have been posted.[11] Plaintiff's chart shows that he generally received an administrative hearing within two weeks of the issuance of a Notice of Package/Mail Rejection. (*Id.*).

- # 0311-084

On March 22, 2011, Mailroom Clerk Karber issued Notice of Package/Mail Rejection # 0311-084. It was incoming mail from "Restoring All Creation, P.O. Box 25, Vassar, Michigan" addressed to plaintiff. The mail was described as "One hand written letter with other Prisoners Information and lock locations (OTIS), 2 pages of information on crime scenes." (ECF No. 68-7, PageID.486). Plaintiff requested a hearing. On April 14, 2011, ARUS Smith conducted the hearing and prepared his Administrative Hearing Report. Plaintiff abandoned any claim to the letter. ARUS Smith read the rejected article, anyway, and he agreed with plaintiff's assertion that this article merely compared fiction to reality and did not pose a threat to the facility. Plaintiff was allowed to have the article. (*Id.* at PageID.487).

- # 0311-085

On March 22, 2011, defendant Karber issued Notice of Package/Mail Rejection # 0311-084. It was incoming mail from "Restoring All Creation, P.O. Box 25, Vassar, Michigan[,]" addressed to plaintiff and described as "Other Inmates Information reject

---

[11]None of the mail has been shown to be legal mail entitled to special handling under Policy Directive 05.03.118.

per Admin Assistant Vroman." (*Id.* at PageID.489). A handwritten notation indicates that A. A. Vroman gave this mail to plaintiff on or about April 12, 2011. (*Id.*).

- ### # 0311-086

On March 22, 2011, defendant Karber issued Notice of Package/Mail Rejection # 0311-084. This was incoming mail from Prison Legal News addressed to plaintiff. The item was described as "Prison Legal News February 2011 Vol 22 No. 2 Article on Torture in America pages 1-9." (ECF No. 68-7, PageID.490). On April 14, 2011, ARUS Smith conducted a hearing. Mr. Smith indicated that he had read the article in detail, and although the title was somewhat offensive, the article did not pose any threat to the security of the prison because it was an article of opinion and it should be looked at as such. Plaintiff was allowed to have this article. (*Id.* at PageID.112).

- ### # 0311-180

On March 29, 2011, defendant Karber issued Notice of Package/Mail Rejection # 0311-084. This was incoming mail from either Heritage Bible Fellowship or Restoring All Creation (both were using the same P.O. Box 25, Vassar, Michigan, address). The mail was described as a John Birch Society publication with the addresses crossed out. (*Id.* at PageID.493). On April 14, 2011, ARUS Smith conducted a hearing and found that the mail fit within the exception provided in P.D. 05.03.118 ¶ MM for copies of a few pages of a publication and plaintiff received the mail. (*Id.* at PageID.494).

- # 0311-181

On March 29, 2011, Mailroom Clerk Karber issued Notice of Package/Mail Rejection # 0311-181. This was mail from Mr. Sabin at Heritage Bible Fellowship (HBF) addressed to plaintiff. The mail was described as "Prisoner Dawson's & Prisoner Alspaugh['s] court Information" and it was noted that both prisoners were housed in the MDOC. (*Id.* at PageID.495).

- # 0411-126

On April 26, 2011, defendant Karber issued Notice of Package/Mail Rejection # 0411-126. This was mail from Prison Legal News addressed to plaintiff. It was two pages of Volume 22 No. 4 of Prison Legal News, pages 42 and 43 of an article about Facebook landing guards and prisoners in hot water and page 46 regarding a dozen Indiana prison employees suspended for positive drug tests which involved contraband smuggling. (*Id.* at PageID.496).

- # 0511-016

On May 5, 2011, Karber issued Notice of Package/Mail Rejection # 0411-126. The mail was described as a copy of an article from the Detroit Free Press "on another MDOC inmate." (*Id.* at PageID.497). On May 11, 2011, ARUS Smith conducted an administrative hearing. Mr. Smith allowed plaintiff to have this newspaper article because he did not believe that it posed a threat to the prison. (*Id.* at PageID.498).

- # 0811-092, # 0811-093, # 0811-094

On August 26, 2011, defendant Karber issued Notice of Package/Mail Rejections # 0811-92, # 0811-093, and # 0811-094. These were postcards from Mr. Sabin, through

HBF, addressed to plaintiff. They were described as a postcards with underlined words that could be a code. Notes indicated that they were being rejected as a threat to security per N. Kilough in Lansing. On September 9, 2011, ARUS Smith conducted an administrative hearing. He did not believe that Mr. Sabin's odd patterns of underlining was a code. He allowed plaintiff to have the postcards. (*Id.* at PageID.507-18).

- # 0811-095, # 0811-096, # 0811-097, # 0811-098, # 0811-099

On August 26, 2011, defendant Karber issued Notice of Package/Mail Rejections # 0811-095, # 0811-096, # 0811-097, # 0811-098, and # 0811-099, all of which were documents from Mr. Sabin, through HBF, which contained the unusual pattern of underlining that could be a code. All the notices indicated that the mail was being rejected as a threat to security per N. Kilough in Lansing. On September 9, 2011, ARUS Smith conducted an administrative hearing, was convinced that the unusual underlining was not a code, and allowed plaintiff to have the correspondence. (*Id.* at PageID.519-32).

- # 0911-021

On September 2, 2011, defendant Lantagne issued Notice of Package/Mail Rejection # 0911-021, which was another document from Mr. Sabin, through HBF, and which contained the unusual pattern of underlining which could be a code. (ECF No. 68-7, PageID.533). On September 14, 2011, ASUS Smith conducted an administrative hearing, again expressed his belief that Mr. Sabin's odd writing pattern was not a code, and allowed plaintiff to have the mail. (*Id.* at PageID.534).

- # 1011-13

On October 21, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1011-13.  It was incoming mail from prisoner Hoffman # 174943 at the Baraga Maximum Correctional Facility addressed to plaintiff.  The notice indicated that this mail described other prisoners' court cases in detail.  On October 27, 2011, ARUS Gehoski conducted an administrative hearing.  Inquiries to Mr. Vroman at the MDOC's Central Office revealed that plaintiff was permitted to receive correspondence from prisoner Hoffman as a witness in a pending civil case.  Ms. Gehoski allowed plaintiff to have Hoffman's letter.  (*Id.* at PageID.538-39).

- # 1111-142B

On November 30, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1111-142B.  It was mail from Mr. Sabin through HBF.  The mail was described as several pages of a letter, which provided personal information such as the full names of prisoners, prison numbers and lock location.  It also included the names of other individuals and phone numbers.  (ECF No. 68-7, PageID.555).  ARUS Gehoski conducted the administrative hearing.  Gehoski conducted an in-depth investigation and found that plaintiff was involved in ongoing litigation with the individuals mentioned in the letter.  Ms. Gehoski did not find that this letter posed a security concern.  Accordingly, plaintiff received this letter.  (*Id.* at PageID.556).

- # 1211-016

On December 5, 2011, defendant Lantagne issued Notice of Package/Mail Rejection # 1211-016.  It was mail from Mr. Sabin through HBF.  The mail was

described as an article from Prison Legal News not sent directly from the publisher. It was double-sided copies of pages 32-37, 40, 41, 48 and 49. (*Id.* at PageID.563). ARUS Gehoski conducted the administrative hearing. Ms. Gehoski found that the copies of these pages generally fit within the exception to the general rule requiring that articles come directly from the publisher. Plaintiff was not allowed to have page 34 because it described in vivid detail the specifics of an Ohio prisoner's escape and hostage taking. (*Id.* at PageID.564).

- # 1211-106

On December 29, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-106. It was mail from Mr. Sabin through HBF. The mail was described as a postcard that was being rejected as a threat to security. (*Id.* at PageID.577). On January 13, 2012, ARUS Erickson conducted the administrative hearing. Mr. Erickson found that the postcard did not pose a threat to security, and plaintiff received it. (*Id.* at PageID.578).

- # 1211-112

On December 29, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-112. It was mail from Prison Legal News. The mail was described as Prison Legal News Volume 22, Number 12, December 2011, with pages 1-10 being a detailed article on sex abuse, page 34 containing a description of a prisoner homicide and a detailed article on a prisoner's escape. (ECF No. 68-7, PageID.579). On January 13, 2012, ARUS Erickson conducted the administrative hearing. Mr. Erickson found that the December 2011 issue of Prison Legal News did not pose a threat to the

safety and security of the prison, and he allowed plaintiff to have it. (*Id.* at PageID.580).

- # 1211-114

On December 29, 2011, defendant Karber issued Notice of Package/Mail Rejection # 1211-114. It was mail from Mr. Sabin through HBF. The mail was described as an envelope from HBF that posed a threat to security. (*Id.* at PageID.581). On January 13, 2012, ARUS Erickson conducted the administrative hearing, found that the item did not pose a threat to security, and plaintiff received the mail. (*Id.* at PageID.582).

- # 0212-043

On February 6, 2012, defendant Lantagne issued Notice of Package/Mail Rejection # 0212-043. It was mail from "Jimmy Sabin." The mail was described as listing names of employees on an affidavit and containing a www.freep.com article containing the names and photos of current MDOC prisoners. (ECF No. 68-7, PageID.584). On February 16, 2012, ARUS Erickson conducted an administrative hearing, found that this mail did not violate policy, and he allowed plaintiff to receive it. (*Id.* at PageID.585).

- # 0312-059

On March 20, 2012, defendant Lantagne issued Notice of Package/Mail Rejection # 0312-059. It was mail from Prison Legal News. It was described as Volume 23, Number 3 for March 2012, detailed articles on prison riots, murder at a correctional facility, prison lockdowns, and prisoner assaults from a gang were found on pages 24,

26, 27, 28, 30, 32 and 36. (*Id.* at PageID.594). On April 9, 2012, ARUS Wayne conducted the administrative hearing. Wayne found that the articles did not encourage criminal activity, and he allowed plaintiff to have this mail. (*Id.* at PageID.597).

On January 29, 2013, Judge Kreeger extended her PPOs against Mr. Sabin for another year. On January 13, 2014, Judge Kreeger extended the PPOs through January 29, 2017.

On March 18, 2014, plaintiff filed his lawsuit.[12] (ECF No. 1).

## Discussion

### I.     Mootness

Plaintiff is an inmate at the G. Robert Cotton Correctional Facility. (ECF No. 76). Defendants are or were employed at ICF. Defendants no longer have any authority over the conditions of plaintiff's confinement. Accordingly, plaintiff's claims for declaratory relief against defendants are moot. *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996).

### II.     First Amendment

#### A.     Free Speech

Plaintiff alleges in Count I that all defendants violated his rights under the First Amendment's Free Speech Clause "to the timely receipt of uncensored United States

---

[12]Three days later, on March 21, 2014, Mr. Sabin filed his lawsuit against defendants. On September 29, 2014, the Court denied Mr. Sabin's motion to consolidate his lawsuit with Mr. Sabin's lawsuit. *See Sabin v. Karber*, 1:14-cv-296 (W.D. Mich.).

First Class Mail while imprisoned with and under the custody and control of the State of Michigan, MDOC at ICF." (ECF No. 1, PageID.13).

Plaintiff was an inmate housed in administrative segregation in a high security level prison after an escape attempt. He did not have any First Amendment right to receive "uncensored" mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-14 (1989). Prisoners have only a limited First Amendment right to receive incoming mail from the outside world. *See Boswell v. Mayer*, 169 F.3d 384, 390 (6th Cir. 1999); *Peters v. Simpson*, No. 1:15-cv-751, 2015 WL 5608237, at *10-12 (W.D. Mich. Sept. 23, 2015); *Annabel v. Armstrong*, No. 1:09-cv-796, 2011 WL 3878379, at * 18 (W.D. Mich. Mar. 30, 2011). Prisoners retain only "those First Amendment rights of speech 'not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system.' " *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others." 468 U.S. at 526.

The Supreme Court's decision in *Hudson v. Palmer* noted that over a mere eighteen-month span, there had been 120 prisoners murdered by fellow inmates in

state and federal prisons, a number of prison personnel murdered by prisoners, 29 riots or similar disturbances, and 125 suicides. In the federal system alone over a one-year period there were 359 inmate assaults on other inmates and 227 inmate assaults on prison staff. 486 U.S. at 526. "Within this volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances." *Id.* at 526-27.

Incoming mail poses a particularly high threat to prison safety and security. *See Thornburgh v. Abbott*, 490 U.S. at 413. The applicable standard is the deferential *Turner* standard: whether the challenged regulation is "reasonably related to legitimate penological interests." 490 U.S. at 413. It was plaintiff's burden of showing that the regulation, as applied by each defendant to each item of incoming mail, was not reasonably related to legitimate penological objectives. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden ... is not on the State to prove the validity of

prison regulations but on the prisoner to disprove it."); *see also Prison Legal News v. Livingston*, 683 F.3d at 215; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *Young v. Weathersby*, No. 1:09-cv-67, 2010 WL 3909463, at *9-10 (W.D. Mich. Sept. 15, 2010). Further, under the second prong of the qualified immunity analysis it was plaintiff's burden on each claim as to each defendant to show that at the time the defendant acted, clearly established existing precedent placed the unlawfulness of the official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424; *see Estate of Hill v. Miracle*, 853 F.3d at 312 ("[T]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (quotation and citation omitted).

In *Turner*, the Supreme Court upheld a total ban against inmate-to-inmate correspondence because it was reasonably related to legitimate penological interests. *See* 482 U.S. at 91-93 ("Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact frequently is prohibited even after an inmate has been released on parole."). Lower courts, applying the *Turner* standard, have upheld more significant restrictions. Complete bans on correspondence between former and current inmates have been upheld. *See Nasir v. Morgan*, 350 F.3d 366, 372 (3d Cir. 2003).

Plaintiff's brief contains discussion of some of the instances where Notice of Package/Mail Rejections were issued. (Plaintiff's Brief at 6-15, ECF No. ECF No. 68, PageID.422-32). Those specific instances are discussed below.

1.    PLN

Plaintiff argues that Mailroom Clerk Kaber should not have issued the Notice of Notice of Package/Mail Rejections # 0511-113 and # 1111-136 regarding portions of the March 2011 and November 2011 issues of PLN and that ARUS Smith and ARUS Gehoski should not have made hearing decisions that plaintiff could not receive those items.  Plaintiff's argument that the articles provided "no more details than can be found in any federal Reporter or Michigan Reports books found in the prison's library" (ECF No. 68, PageID.422-23) is not persuasive.  Plaintiff retained access to reporters because he has a right of access to court.  Plaintiff was housed in administrative segregation at ICF after his failed escape attempt.  It was patently reasonable for MDOC employees at ICF to try to keep from plaintiff the details of how an Arizona prison break had been accomplished and how the escapees "left behind a deadly trail of crime that included hijacking 18-wheelers, kidnapping, two murders, aggravated assaults and a shootout with the police." (ECF No. 68-17, PageID.658).   The same is true for the rejection of the story describing how the Ohio prisoner escaped from his hospital bed restraints and then overpowered a guard, stole a car, robbed banks and took a hostage.  (*Id.* at PageID.661).  Plaintiff's subsequent ability to find the articles at a different prison simply undermines his claim that he suffered damages, not that the decisions made to try to keep this material out of his hands were incorrect, much less a First Amendment violation.

2.    Prisoner Hoffman

Plaintiff presents no argument regarding Notice of Package/Mail Rejection # 1011-13 issued by defendant Karber regarding the mail from prisoner Hoffman at the Baraga Maximum Correctional Facility.  (*See* Plaintiff's Brief at 6-15, ECF No. 68, PageID.422-31).   ARUS Gehoski conducted an administrative hearing and her inquiries to Mr. Vroman at the MDOC's Central Office revealed that plaintiff was permitted to receive correspondence from prisoner Hoffman and she allowed plaintiff to have Hoffman's letter.  Plaintiff did not submit Hoffman's letter.  Plaintiff has not submitted evidence sufficient to raise a genuine issue of fact for trial on claims based on the handling of prisoner Hoffman's letter.[13]

3.    Mr. Sabin

Plaintiff's remaining arguments relate to some of the Notice of Package/Mail Rejections for materials sent by Mr. Sabin.  Plaintiff argues that he should have been allowed to receive the map/photograph of Mr. Sabin's property that had been the subject of Notice of Package/Mail Rejection # 0811-061 because the decision to keep it out of his hands was arbitrary and an exaggerated response.  (ECF No. , PageID.424-25).  Attempting to keep an aerial photograph of property owned by highly supportive convicted felon outside ICF (ECF No. 68-18, PageID.662) from an inmate with a history of making detailed escape plans was neither arbitrary nor exaggerated.

---

[13]Prisoner Hoffman's role in plaintiff's attempt to escape by tunneling out of the Kinross Correctional Facility is described in greater detail in *Hoffman v. Rutter*, 2011 WL 4560916, at *5-8.

ARUS Smith conducted the administrative hearing on Notice of Package/Mail Rejection # 0811-061. The Administrative Hearing Report indicates that the items at issue were a detailed Google Map and a letter which might have contained a coded message. Although the hearing officer had concerns about the odd pattern of underlining, which appeared under words which would not normally be underlined for purposes of emphasis,[14] he nonetheless allowed prisoner Murphy to have this letter. ARUS Smith did not allow prisoner Murphy to have the detailed Google map. (*Id.* at PageID.505).

Plaintiff states that after he was transferred to the Bellamy Creek Correctional Facility in 2012, he was able to obtain from Mr. Sabin a "USGS National Water Information System Mapper photograph of the Sabin homestead" without having a Notice of Package/Mail Rejection issued by MDOC employees at Bellamy Creek. Plaintiff considers the USGS photograph to be the as the equivalent of the rejected Google map. (Murphy Aff. ¶ 24, ECF No. 68-2, PageID.468; ECF No. 68-18, PageID.662).

---

[14]Mr. Sabin provided typing services for plaintiff. (Plf. Dep. at 19, ECF No. 68-1, PageID.446). It is noted that none of Mr. Sabin's odd handwritten letters have been presented as evidence in support of plaintiff's claims. Sabin states that almost all his letters to MDOC inmates were and are hand-printed and they "didn't require a computer to compose." (Sabin Aff. ¶ 12, ECF No. 68-21, PageID.693). Sabin states that his that his "generally *hand[-] printed* letters"use recognized English forms such as underlining, upper case letters, blocks, bold, italics to "explain the relevancy of materials sent, offer suggestions and strategies on issues, and share life stories." (*Id.*).

Plaintiff describes the mail that was the subject of Notice of Package/Mail Rejection # 0811-054 as a "political recall petition" (Plaintiff's Brief at 7, ECF No. 68, PageID.423). Plaintiff argues: "It is entirely possible, even if it is only in plaintiff's argument herein, that defendants censored these materials because they disagreed with the recall efforts advocated for in those petitions." (*Id.* at 8, PageID.424). Plaintiff did not submit a copy of the recall petition, and his brief provides nothing beyond conjecture. The materials were rejected because they did not fall within the items that plaintiff was allowed to possess. (ECF No. 68-7, PageID.502).

Michigan's prison inmates are not entitled to become registered voters. *See Wyers v. Bannan*, 249 F.2d 136 (1957); *see also Moore v. Michigan Dep't of Corr.*, 2:10-cv-213, 2010 WL 4007609, at * 2 (W.D. Mich. Oct. 12, 2010) (Dismissing a prisoner's complaint for failure to state a claim because "persons serving a sentence in jail or prison are not eligible to vote."); *Crowdog v. Genesee County Canvassers*, No. 04-cv-74076, 2005 WL 1027586, at *1 (E.D. Mich. Apr. 20, 2005) (The court finding no violation of a prisoner's constitutional rights by a refusal to send an inmate's request for voter registration forms "because plaintiff was not qualified to become a registered voter and there was no point in bothering the County Clerk with unnecessary correspondence."). Michigan prisoners cannot provide valid signatures to recall petitions because they are not registered and qualified electors. *See* MICH. COMP. LAWS §§ 168.954, .958. The rejection of the recall petition did not violate plaintiffs' constitutional rights.

Plaintiff did provide the Court with a copy of a "2011-2012 Opinion Petition to the Michigan Legislature" (ECF No. 68-14, PageID.648-49). It was the subject of Notice of Package/Mail Rejection # 0911-040 issued by Mailroom Clerk Lantagne and an administrative hearing decision by ARUS Gehoski. Ms. Gehoski's hearing report described her findings and reason for findings in these terms: "This mail will not be given to Murphy pursuant to PD 05.03.118 and OP 05.03.118 # 8. Personal official documents including social security cards, GED certificates, birth certificates, marriage certificates, military discharge paperwork, diplomas or similar official documents.'" (ECF No. 68-7, PageID.535-36). The rejection of the petition form was overturned through the grievance process not based on any determination that plaintiff was entitled to receive the petition, but on a finding that the description that Mr. Lantagne provided in the Notice was deficient. "A new Notice and administrative hearing would be in order, however[;] the record indicates that the document was returned to the sender on 12-14-11. No further action is necessary pursuant to the grievance process." (ECF No.68-8, PageID.604). Plaintiff concedes that during his subsequent incarceration at the Bellamy Creek Correctional Facility, in July 2012 he received a copy of the petition from Mr. Sabin. (Plf. Aff. ¶ 20, ECF No. 68-2, PageID.466-67; ECF No. 68-14, PageID.648-49). The instruction state "[s]end you petitions – with one or more signers" to state legislators." (ECF No. 68-14, PageID.649). Thus, if plaintiff wanted to do so, he could have completed the 2011-2012 petition form and sent it to his state legislators in a timely fashion.

The arguments the parties offer regarding this blank form are not helpful. The form does not appear to be "personal correspondence" as plaintiff suggests. (Plaintiff's Brief at 9, ECF No. 68, PageID.425). The form could be considered as posing a danger of supplying prisoners with personal information which could aid or facilitate criminal activities of prisoners (*see* Defendants' Brief at 3, ECF No. 63, PageID.331) if the Court had received evidence from the parties regarding how they believed that the petition form would be circulated in order to obtain signatures from individuals and the nature of the target audience. The Court finds no constitutional violation. Further, plaintiff has certainly not carried his burden of demonstrating that the actions of defendants Lantagne or Gehoski with regard to this form violated any clearly established constitutional rights in the particularized sense required to overcome their claim of entitlement to qualified immunity.

Plaintiff claims that his constitutional rights were violated when Mailroom Clerk Karber issued Notice of Package/Mail Rejection # 1011-020 and #1011-021 and when ARUS Gehoski conducted administrative hearings on those notices and found that allowing the detailed articles regarding the Attica Prison riots into ICF posed a threat to the security and good order of the prison and encouraged criminal activity. (ECF No. 68-7, PageID.540-45). Plaintiff produced a copy of the New York Times article that was the subject of Notice of Package/Mail Rejection # 1011-020 (ECF No. 68-12, PageID.635-36). Upon review, the Court finds that this is precisely the type of incoming document where the Court must give significant deference to decisions made by prison administrators to exclude it. Depending on the reader's perspective, the "op-

-37-

ed" article could either be viewed as a strong endorsement of much-needed penal reforms in New York or as supplying justifications for prisoners to riot and to take and kill hostages. Plaintiff has not addressed, much less carried his burden of demonstrating that the actions of defendants Karber or Gehoski with regard to articles regarding the Attica prison riots violated any clearly established constitutional rights in the particularized sense required to overcome their claim of entitlement to qualified immunity.

Next, plaintiff's challenge is limited to one single item out of the multiple items that Mr. Sabin sent that were the subject of Notice of Package/Mail Rejection # 1111-115. (ECF No. 68-7, PageID.546-47). Plaintiff argues that the rejection of a 58-page article regarding the Psychiatric Effects of Solitary Confinement which had been sent by Mr. Sabin rather than the publisher violated plaintiff's First Amendment rights. (Plaintiff's Brief at 10-11, ECF No. 68, PageID.426-27). ARUS Gehoski found that Prisoner Murphy had received mail containing copies of a publication including a table of contents that were not direct from the publisher. She quoted PD 05.03.118 ¶ MM(8) and emphasized that 58 pages was "more than a few pages." (ECF No. 68-7, PageID.547). The publication was not from an approved vendor. (PD 05.03.118, ¶ CC, ECF No. 68-10, PageID.617, 624-25). Paragraph MM(8) of the policy directive allows a limited exception to the authorized vendor requirement: "This does not apply to an article or a few pages, or copies of a few pages, or copies of a few pages, from a publication that may be included with a letter or other mail, unless it is reasonably believed to be an attempt to circumvent this restriction." (*Id*. at ¶ MM(8), PageID.618).

Plaintiff's argument that he was not limited in the number of pages in any "article" appears to be based on a typographical error where "or" rather than "of" appears in the policy directive. An "article or a few pages" makes no sense because there is nothing for "a few pages" to modify. A few pages of what? An article of a few pages, makes sense, and is consistent with the purpose of creating an exception to the vendors rule allowing for a few pages of an article or other publication. A finding that this mailing did not fit within the limited exception was reasonable. Plaintiff has not presented evidence sufficient to raise a genuine issue of material fact for trial on his claims based on the rejection of this article.

Plaintiff argues that the mail that was the subject of Notice of Package/Mail Rejection # 1111-142C by Mr. Karber and the hearing decision by ARUS Gehoski violated his First Amendment rights. The November 30, 2011, Notice of Package/Mail Rejection # 1111-142C indicated that this was mail from Mr. Sabin through HBF. The mail was described as eight pages printed off the Internet regarding doctors and psychologists with personal information such as license type, addresses, full names, and professions. (ECF No. 68-7, PageID.559). ARUS Gehoski conducted the administrative hearing. She found that the mail contained very personal information such as license type, profession, permanent ID numbers, addresses, etc. Gehoski found that this information was not allowed per policy and that plaintiff would not be given the papers. (*Id.* at PageID.560). Plaintiff sought review through the MDOC's grievance process. On November 29, 2012, the Grievance and Appeals Section issued an amended Step III response finding that the material appeared to contain only

professional information rather than personal information about a particular mental health professional. It overruled the rejection of this mail. (ECF No. 68-9, PageID.610). Once again, plaintiff elected not to support his claims with the underlying documents.

Plaintiff's claims against defendants Karber and Gehoski based on this Notice of Package/Mail Rejection fail for lack of supporting evidence. Absent the underlying communication, plaintiff fails to present evidence on which a reasonable trier of fact could find a violation of his First Amendment rights.

With regard to Notice of Package/Mail Rejection # 1111-142A, # 1211-037, # 1211-063, # 1211-084, # 0212-073, and # 0212-120, plaintiff argues that defendants have failed to submit evidence supporting their censorship of this information. (Plaintiff's Brief at 13-15, ECF No. 68, PageID.429-31). Defendants were not required to present evidence "negating" plaintiff's claims. *See Morris v. Oldham County Fiscal Court*, 201 F.3d at 787. It was plaintiff's burden to come forward with evidence sufficient to raise a genuine issue of fact for trial with regard to every item of incoming mail that he claims was wrongfully rejected by each defendant. *See Celotex Corp. v. Catrett*, 477 U.S. at 323. Plaintiff made the choice not to provide the Court with copies of the underlying items that were the subject of his claims and it is fatal to those claims. He has not presented evidence on which a reasonable trier of fact could find that defendants violated his First Amendment rights by rejecting those items.

The Third Circuit's decision in *Nasir v. Morgan*, is particularly instructive with regard to all mail sent by Mr. Sabin and his sole proprietorship HBF.[15]  In that case the court of appeals upheld a ban prohibiting all correspondence between former inmate and a current inmate because, among other things, prisoners can develop code or jargon to prevent detection of their real messages and there would be "an inherent risk of missing dangerous communications both through use of deceptive language and due to the volume of incoming mail that prison staff would be required to read and review[.]" 350 F.3d at 373-74.  With regard to the first prong of the *Turner* test, there was a rational connection between the prison regulation in question and the legitimate governmental interest which justifies it.  The first element of the *Turner* test was satisfied because correspondence sent by a former prisoner to a current inmate poses a particularly high risk because the former inmate "has greater access to people and items that could lead to crimes outside or inside the prison." *Id.* at 372.  Alternative means of exercising the right remained available.  The restriction did not bar prisoners from all forms of correspondence.  At issue was "communication with a limited class of other people with whom prison officials are concerned: former prisoners. Outside of

_____

[15]*See also Smith v. Parker*, 7 F. App'x 432, 434 (6th Cir. 2001) (upholding rejection of incoming mail under a policy prohibiting inmates at one prison from providing legal assistance to prisoners at another prison); *Jackson v. Pollard*, No. 07-C-28, 2007 WL 1556867, at * 3 (W.D. Wisc. May 25, 2007) (Coded prisoner communications "could be used to further drug trafficking, convey escape plans, relay gang messages, plan disturbances, order attacks on staff and other inmates and engage in other criminal conspiracies.").

this limited class, prisoners are free to communicate with most any other individual." *Id.* (citation omitted).

In assessing the impact of accommodating the asserted right on other inmates and prison personnel, "communication with former prisoners has a significant potential negative impact on the rights of other inmates and prison personnel; an impact sufficient to justify imposing limits on that communication." *Id.* at 372-73. The risks include "escape, retaliation, introduction of contraband, and other illegal activity." *Id.* at 373. Finally, the court considered the availability of ready alternatives to the regulation. The only alternative offered was the complete monitoring of inmate correspondence to prevent all dangerous communication. Reading every piece of correspondence from a former inmate would be impossible and create an appreciable risk of missing dangerous messages. The court recognized the real possibility that prisoners develop jargon or code to prevent detection of their real messages. There would be an inherent risk of missing dangerous communications, both through the use of deceptive language and due to the volume of incoming mail that prison staff would be required to read and review, it did not present a reasonable alternative to the policy prohibiting such correspondence. *Id.* at 373-74.

The volume of material that Mr. Sabin sent cuts against rather than in favor of plaintiff's claims. *See Young v. Weathersby*, 1:09-cv-67, 2010 WL 3909463, at *8 (W.D. Mich. Sept. 15, 2010) (rejection of mail so voluminous that it could not easily be readily reviewed for contraband or other threats passed review under *Turner* because a

contrary rule would allow the sender simply to hide harmful content in a sufficiently large quantity of other papers to thwart detection); *see also Hall v. Johnson*, 224 F. Supp. 2d 1058, 1060 (E.D. Va. 2002) (upholding policy where all general purpose correspondence over one ounce in weight was rejected because it "further[ed] the legitimate governmental interest of institutional security because it allow[ed] mail room personnel to quickly scan a shorter document for potential security risks, such as escape plans").

In summary, the Court finds that plaintiff has not presented evidence on which a reasonable trier of fact could find in his favor on any claim under the First Amendment's Free Speech Clause against defendants.

Further, the Court finds that defendants are entitled to judgment in their favor because plaintiff has not carried his burden under the second prong of the qualified immunity analysis. *See Johnson v. Moseley*, 790 F.3d at 653. Plaintiff has not shown that the rejection of any item of incoming mail by defendants violated any clearly established constitutional right. *See White v. Pauly*, 137 S. Ct. at 551-52. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 135 S. Ct. at 350. Thus, even if plaintiff had presented evidence that a defendant or defendants made a mistake in rejecting one or more of the items of incoming mail, plaintiff would still fall well short of showing that at the time the defendants acted existing precedent placed the constitutional question "beyond debate." *See White v. Pauly*, 137 S. Ct. at 551.

Plaintiff's claims based on perceived delays in processing mail and conducting administrative hearings fare no better. Under the second prong of the qualified immunity analysis it was plaintiff's burden to demonstrate that the right each official is alleged to have violated was "clearly established" in a particularized sense. The Supreme Court and the Sixth Circuit have never recognized a constitutional right of a high security level prisoner serving multiple life sentences and housed in administrative segregation after an escape attempt to receive voluminous incoming mail from a convicted felon and/or his sole proprietorship within any particular time period. The unpublished district court cases cited by plaintiff (Plaintiff's Brief at 3, ECF No. 68, PageID. 419) are not remotely analogous, and they do not clearly establish the constitutional rights that plaintiff claims. Two decisions from outside the Sixth Circuit warrant brief examination because they illustrate the unsettled nature of the law in this area.

In *Rowe v. Shake*, 196 F.3d 778 (7th Cir. 1999), the Seventh Circuit suggested that a claim based on interference delaying a prisoner's timely receipt of incoming mail from a non-attorney was possible, but held that the relatively short term and sporadic delays alleged by the plaintiffs failed to state a First Amendment claim. *Id.* at 782-83. In *Ahlers v. Rabinowitz*, 684 F.3d 53 (2d Cir. 2012), the Second Circuit found it unnecessary to articulate a standard for a claim based on an alleged delayed receipt of mail because the plaintiff could not support a claim that the purported interference with his non-legal mail was regular or unjustifiable. The Second Circuit found that the

plaintiff had alleged several brief delays and that was insufficient to state a claim. *Id.* at 64.

Plaintiff has not carried his burden and defendants are entitled to qualified immunity.

      B.    <u>Freedom of Association</u>

In Count II, plaintiff alleges that all defendants violated his First Amendment right of expressive association. (ECF No. 16-17).

In *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003), the Supreme Court emphasized that the "very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. And, as our cases have established, freedom of association is among the rights least compatible with incarceration." The Court went on to hold that the MDOC's regulation prohibiting visitation by former inmates bears "a self-evident connection to the State's interest in maintaining prison security and preventing future crimes. We have recognized that 'communication with other felons is a potential spur to criminal behavior.' " *Id.* at 133-34 (quoting *Turner v. Safley*, 482 U.S. at 91-92). Defendants acted in 2011 and 2012. In April 2015, this Court noted that "the Sixth Circuit ha[d] not decided the degree to which prison inmates retain their freedom of association." *Lechner v. County of Marquette*, No. 2:15-cv-5, 2015 WL 1963005, at * 6 (W.D. Mich. April 30, 2015).

Mr. Sabin is a convicted felon and registered sex offender. Plaintiff has not attempted to carry, much less has he carried his burden of demonstrating how the action of each defendant with regard to each item of incoming mail from Mr. Sabin violated his clearly established First Amendment right of freedom of association with Mr. Sabin

      C.    <u>Retaliation</u>

In Count III, plaintiff alleges that defendants Karber and Lantagne retaliated against him in violation of his First Amendment rights. (ECF No. 1, PageID.17-18). On summary judgment, a plaintiff asserting a First Amendment retaliation claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). The plaintiff has the burden of proof on all three elements. *See, e.g., Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

Plaintiff argues that his "prior grievances and lawsuits" provide the protected conduct. (Plaintiff's Brief at 16-17, ECF No. 68, PageId. 432-33). Plaintiff's vague allusion to past grievances does not suffice at the summary judgment stage. He was more specific, however, regarding his lawsuits. Plaintiff provides a partial citation to a lawsuit that he filed in 2007 and he references "*Murphy v. Lockhart, et al.*, USDC ED

No. 2:10-cv-116." The latter lawsuit provides sufficient evidence of protected conduct. *See Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002).

Plaintiff filed Case No. 2:10-cv-116 on April 26, 2010, in the United States District Court for the Eastern District of Michigan. Plaintiff claimed violations of his rights under Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First and Fourteenth Amendments through 42 U.S.C. § 1983 and some of his claims withstood motions for summary judgment.[16] *See Murphy v. Lockhart*, 826 F. Supp. 2d at 1021. On October 24, 2011, the Court found that plaintiff would benefit from the assistance of counsel and conditionally granted his renewed appointment of counsel. An attorney from the Eastern District's *pro bono* panel accepted the assignment. On January 9, 2012, the Court entered an order documenting the assignment and setting a January 30, 2012, status conference. Case No. 2:10-cv-116 concluded a little over a year later, on February 19, 2013, when Judge Lawson entered an order of dismissal

---

[16]Among the claims that did not survive defendants' motions for summary judgment were his claims against mailroom employees at the Standish Correctional Facility based on allegations that rejection of a "copy of the religious book, *Codex Magica* – violated his rights to due process, free exercise of religion, free speech, and his rights under the RLUIPA[.]" 826 F. Supp. 2d at 1024. With regard to the RLUIPA claims, Judge David Lawson held that "[e]ven if the mail rejection placed a substantial burden on the plaintiff, the rejection was justified by a legitimate penological interest in preventing texts containing instructions on how to write in code from entering the prison." *Id.* at 1034. On the First Amendment claim, Judge Lawson held: "It is without question that a prison has a legitimate penological interest in limiting prisoners' access to books that include instructions on how to write in code. The safety and security of other prisoners and the prison staff depend on it. The only way to protect this interest is to reject the *Codex Magica*." *Id.* at 1035.

without prejudice and without costs, and neither party applied to reopen the case before the deadline of April 20, 2013, to enforce the terms of the settlement.

Plaintiff's claims against defendants fall short on the second element. The adverseness inquiry is an objective one, and it does not depend on how a particular plaintiff reacted. *Bell v. Johnson*, 308 F.3d at 606. Prisoners are expected to endure more than the average citizen. *See Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005).

Plaintiff states that the PPOs against Sabin "had an adverse effect on him" (Plaintiff's Brief at 18, PageID.434), but this is insufficient to support a claim. Judge Kreeger determined that the PPOs were appropriate and necessary to protect Karber and Lantagne from Mr. Sabin's mail to plaintiff which was intended to frighten, harass, and intimidate the mailroom clerks. 2014 WL 2118226, at *2.

Plaintiff points to the number of Notice of Package/Mail Rejections issued by Karber and Lantagne as an adverse action. (Plaintiff's Brief at 17, PageID.433). The Court does not find this argument to be persuasive. Mr. Sabin's strategy was to "build a record of a lot of rejections." (Plf. Dep. at 58, ECF No. 68-1, PageID.460). Plaintiff generally elected not to support his claims against defendants with the underlying documents that were the subject of the Notice of Package/Mail Rejections. Plaintiff has not presented evidence that Mr. Sabin's communications were as innocuous as he now claims. Plaintiff has not presented evidence sufficient to support the second element of a retaliation claim.

With regard to the causation element, plaintiff has not presented argument and evidence connecting his protected conduct in Case No. 2:10-cv-116, with the Notice of Package/Mail Rejections issued by Karber or Lantagne. (Plaintiff's Brief at 19-21, ECF No. 68, PageID.435-37). Plaintiff presented no evidence that Karber or Lantagne knew of plaintiff's lawsuit, much less that each defendant's actions were motivated, at least in part, by the protected conduct. (Karber Dep., ECF No. 68-19; Lantagne Dep., ECF No. 68-20). Plaintiff elected not to file transmittal envelopes[17] and underlying documents that could have possibly provided supporting circumstantial evidence.

Plaintiff has not presented evidence that the actions of defendants Karber or Lantagne violated any clearly established constitutional right. Simply mentioning the Sixth Circuit's *Thaddeus–X* decision does not suffice because that case did not address similar circumstances. The Supreme Court has repeatedly emphasized that the second prong of the qualified immunity analysis must be undertaken in light of the specific context of the case, not as a broad general proposition. *See White v. Pauly*, 137 S. Ct. at 552. Courts are not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.* In order to be clearly established,

---

[17]Plaintiff did provide one envelope where "Restoring All Creation" and HBF at P.O. Box 25, Vassar, Michigan, appeared in the return address. It was almost certainly from Mr. Sabin, but it contains no reference to plaintiff's lawsuit and nothing on the face of the envelope expresses a claim of entitlement to special handling. (ECF No. 68-3, PageID.471).

existing precedent must have placed the unlawfulness of the official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424.

## III. Due Process

In Count IV, plaintiff alleges that defendants Karber and Lantagne violated his rights under the Fourteenth Amendment's Due Process Clause. (ECF No. 1, PageID.18-19). Plaintiff characterizes his claim as being "premised on deliberate, vindictive, and retaliatory withholding and destruction of [his] incoming United States First Class mail without any prior notice by defendants Lantagne and Karber." (Plaintiff's Brief at iii, ECF No. 68, PageID.412).

Plaintiff's due process claims are barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. Because plaintiff's claims are premised upon allegedly unauthorized acts of a state officials, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995).

Plaintiff has not sustained his burden in this case. Plaintiff has not presented evidence that his state post-deprivation remedies were inadequate. It is well established that his available post-deprivation remedies were adequate. *See Bentley*

*v. Allen*, No. 1:15-cv-313, 2015 WL 3626715, at *5 (W.D. Mich. June 10, 2015); *Gavin v. Abood*, No. 08-11763, 2009 WL 3199057, at *16 (E.D. Mich. Sept. 30, 2009); *Mitchell v. Isaacson*, No. 2:08-cv-6, 2008 WL 2437513, at *2-4 (W.D. Mich. June 9, 2008); *see also Murphy v. Lockhart*, 826 F. Supp. 2d at 1036 ("[P]laintiff ha[d] not shown a lack of adequate post-deprivation remedies with respect to the censorship of the *Codex Magica*" and he had "the extensive post-deprivation procedural protections afforded to all prisoners."). Arguments that a "notice and hearing were not as timely as [the prisoner] would have liked or as he believes were required by prison procedures" does not suffice to support a due process claim. *See Bentley*, 2015 WL 3626715, at *6. In addition, the "Due Process Clause does not guarantee that the procedure will produce a correct decision." *Id.* "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284 n.9 (1980). "[T]he deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original);

Defendants are entitled to qualified immunity on the first prong of the qualified immunity analysis for the reasons noted above. They are entitled to qualified immunity under the second prong of the qualified immunity analysis because plaintiff

has not attempted to carry his burden of showing how the actions of each defendant with regard to each item of incoming mail violated his clearly established constitutional rights under the Fourteenth Amendment's Due Process Clause.

## IV.    Supplemental Jurisdiction

Plaintiff asks the Court to exercise jurisdiction over purported state-law claims. "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003).  Generally, where all federal claims have been dismissed, federal courts decline to exercise supplemental jurisdiction over state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009); *see also Shaver v. Brimfield Twp.*, 628 F. App'x 378 384 (6th Cir. 2015). There is no reason in this case to depart from the general rule.

### <u>Conclusion</u>

For the foregoing reasons, plaintiff's request for declaratory relief will be dismissed as moot.  Defendants' motion for summary judgment (ECF No. 62) will be granted on all plaintiff's federal claims.  The Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's purported state-law claims.


Dated: _September 20, 2017_                    /s/ Paul L. Maloney
                                                                   Paul L. Maloney
                                                                   United States District Judge